

ORIGINAL

Priority ✓
Send ✓
Enter ✓
Closed
JS-5/JS-6 ‗NO‗
JS-2/JS-3 ‗‗‗‗
Scan Only ‗‗‗‗

FILED
CLERK, U.S. DISTRICT COURT

MAR ‒ 9 2006

CENTRAL DISTRICT OF CALIFORNIA
BY            DEPUTY

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

TOYOTA MOTOR SALES, U.S.A., INC., )

                                      ) Civil Action No. CV03-8506 DSF (Ex)

                                      )

              Plaintiff           ) FINDINGS OF FACT AND

                                      ) CONCLUSIONS OF LAW

vs.                                      ) AFTER COURT TRIAL

FARZAD TABARI and LISA TABARI    )

doing business as FAST IMPORTS         ) (NOT FOR PUBLICATION)

                                      )

              Defendants      )

## I.  FINDINGS OF FACT

     The following findings of fact are based on the evidence presented at trial on August 10-11, 2005 ("Tran."), and the uncontested facts set forth in the Final Pre-Trial Conference Order ("FPTCO").

## A.    **ADOPTION, USE AND REGISTRATION OF THE MARK LEXUS**

     1.     Plaintiff commenced using the mark LEXUS in connection with the sale of vehicles and related services in September 1989 and has used the mark continuously since that date.  (FPTCO, p. 4.)





2.     The expansion of the LEXUS product line is detailed in Plaintiff's Ex. 12, a timeline that is available on Plaintiff's website accessed by the domain name <www.lexus.com>. (Tran., pp. 37-38.)

3.     The mark LEXUS is a coined word that has no dictionary definition and no significance other than as an identification of a line of automobiles. (FPTCO, p. 4; Tran., p. 40.)

4.     Since 1989, sales of LEXUS vehicles and related parts, accessories and services in the United States have exceeded fifty billion dollars ($50,000,000,000). (Tran., pp. 69-76; Plaintiff's Exs. 14-27.)

5.     LEXUS vehicles are manufactured by Plaintiff's corporate parent Toyota Motor Corporation ("TMC"), and are sold by Plaintiff through a network of Lexus dealers to the general public in the United States and Canada. (Tran., p. 39.)

6.     By virtue of an agreement with TMC, Plaintiff is the exclusive distributor of LEXUS vehicles in the United States. (*Id.*, p. 40.)

7.     The mark LEXUS is used as a brand identification for a line of vehicles, services provided by Lexus dealers, and leasing and finance services. (*Id.*) In addition, the mark LEXUS is used in connection with an extensive line of promotional products such as apparel, luggage, sunglasses and watches. (*Id.*, pp. 41-43; Plaintiff's Ex. 11.)

8.     LEXUS vehicles have been extensively advertised and promoted on a national basis to the general public by the use of various media, including print (*i.e.*, newspapers and magazines), radio, and television since at least as early as 1989. (Tran., pp. 43-48; Plaintiff's Ex 8.)

2

9.      Plaintiff also sponsors a wide variety of promotional and charitable events where LEXUS vehicles are displayed to the general public. (Tran., pp. 46-48; Plaintiffs' Exs. 9 and 10.)

10.     In 1996, Plaintiff began advertising LEXUS vehicles on the Internet using a website accessed by the domain name <www.lexus.com> which Plaintiff registered on January 22, 1993. (Tran., pp. 48 and 113-115; Plaintiff's Exs. 13 and 77.) Plaintiff registered the domain name <www.buyalexus.com> on August 18, 1998. (Plaintiff's Exs. 13 and 78.)

11.     The domain name <www.buyalexus.com> has been used to redirect Internet users to the LEXUS website at <www.lexus.com> since as early as January 1999. (Tran., pp. 149-153).

12.     The purpose of the domain names <www.lexus.com> and <www.buyalexus.com> is to enable consumers to access Plaintiff's LEXUS website illustrations of which were admitted into evidence. (Tran., pp. 114-116; Plaintiff's Exs. 13, 74, 75 and 77.)

13.     Plaintiff's website advertises LEXUS vehicles, product features, financing services and enables consumers to locate franchised Lexus dealers. (Tran., pp. 115-116 and 118-120.) The annual number of visitors to the LEXUS website has grown from 1.2 million visitors in 1996 to more than 14 million visitors in 2004. (Tran., p. 49.)

14.     LEXUS vehicles have received numerous accolades and awards from automotive associations and publishers since as early as 1990. (Tran., pp. 37-39; Plaintiff's Ex. 12.) For example, in 1998 the LEXUS RX 300 became the first sports

3

utility vehicle to be named car of the year by *Motor Trend* Magazine and in 1999 the

LEXUS GS 400 and 300 models were named by *Car and Driver* magazine as among the

ten best cars on the market.  (Tran., p. 38; Plaintiff's Ex. 12.)

15.    The expenditures for the LEXUS line since 1989 have been extensive.  Prior

to 1999, Plaintiff spent approximately one hundred fifty million Dollars ($150,000,000)

annually in promoting LEXUS vehicles.  (Tran., p. 51.)  The current level of annual

advertising expenditures exceeds two hundred fifty million dollars ($250,000,000).  (*Id.*)

Between 5% to 6% of that amount is devoted to Internet advertising.  (*Id.*)

16.    TMC is the owner of the following federal registrations of the mark LEXUS:

(a)    Registration No. 1,574,718 of the mark LEXUS, for automobiles, which issued  January 2, 1990.

(b)    Registration No. 1,675,339 of the mark LEXUS, for repair and maintenance services for automotive vehicles and automotive vehicle leasing services, which issued February 11, 1992.

(c)    Registration No. 1,739,201 of the mark LEXUS, for financing the purchasing and leasing of automobiles, which issued December 8, 1992.

(d)    Registration No. 2,016,803 of the mark LEXUS CUSTOM TAILORED LEASE, for vehicle renting and leasing services, which issued November 19, 1996.

(Plaintiff's Exs. 1-4.)

4

17.     Each of these registrations has achieved incontestable status under § 15 of the Federal Trademark Act, 15 U.S.C. § 1065.  (Plaintiff's Exs. 1-4.)

## B.     DEFENDANTS' ADOPTION AND USE OF THE DOMAIN NAMES AND SERVICE MARK IN ISSUE

1.     Defendant Farzad Tabari is the sole proprietor of Fast Imports an automobile brokerage business that specializes in LEXUS vehicles.[1]  (Tran. 80:22-81:4.)

2.     Defendants use the domain names <www.buyorleaselexus.com> and <www.buy-a-lexus.com> ("Defendants' domain names") in connection with an automobile brokerage business that specializes in LEXUS vehicles.  (FPTCO, pp. 4-5.)

3.     Although Defendants' brokerage business specializes in LEXUS vehicles, luxury vehicles other than those sold by Plaintiff also are offered as part of Defendant's brokerage business.  (Tran., pp. 98, 159, 169-70; Plaintiff's Ex. 34.)

4.     Defendants' customer base consists of members of the general public who, although they may own businesses, purchase these cars in their individual capacity.  (Tran., p. 86.)

5.     Defendants' advertising is directed to the general public.  (*Id.*, pp. 95-99; Plaintiff's Exs. 34, 43, 45 and 49-52.)

---

[1]  Defendants have submitted Proposed Findings of Fact and Conclusions of Law that contain no references to the evidence or testimony presented.  Some of the proposed facts are not supported by the evidence, and others are simply irrelevant.  Even if all of the proposed facts had been supported by evidence, the Court's ruling would remain the same.

6.      Although Defendants' brokerage activities with respect to LEXUS vehicles involve contacts with several Lexus dealers, Defendants do not have a contractual relationship with any Lexus dealer. (Tran., p. 81.)

7.      In December 1999, several months after starting Defendants' automobile brokerage business, Defendant Lisa Tabari registered Defendants' domain names. (FPTCO, p. 5; Tran., p. 87.)

8.      Ms. Tabari initially attempted to register the domain name <www.buyalexus.com>, but, on learning that it had previously been registered by Plaintiff, she registered the hyphenated version of that domain name, *viz.*, <www.buy-a-lexus.com>. (Tran., p. 163.)

9.      A few days later, Ms. Tabari also registered the domain name <www.buyorleaselexus.com> and, shortly thereafter, Defendants began operating a website accessed by the domain name <www.buyorleaselexus.com>. (FPTCO, p. 5.) Defendants' prospective customers typically contact them by using that website. (Tran., pp. 81-82.)

10.     Both of Defendants' domain names, as well as the designation WWW.BUYORLEASELEXUS.COM prominently used in their advertising, incorporate the mark LEXUS. (FPTCO, p. 5; Plaintiff's Exs. 34, 43, 45, 50-52, 54 and 71.)

11.     Ms. Tabari contacted a few fleet managers to determine who to contact about web hosting services.  Some of them mentioned The Cobalt Group, Inc. ("Cobalt"). (Tran. 163:23-164:3.)

12.    Cobalt has been the sole endorsed provider of E-business products and services to LEXUS since 1996.  (Tran. 64:1419.).

13.    Although Cobalt established a website for Defendants, it was not authorized to do so.  (Tran. 122:11-20.)

14.    The initial website used by Defendants displayed the mark LEXUS in the stylized form typically used by Plaintiff as well as the Lexus L Symbol Design. (Tran., p. 90; Plaintiff's Ex. 71.)

15.    Although Defendants did not personally select the photographs or visual portions of their initial website (Tran., p. 168), Defendants benefitted from that usage and continued to use these images until well after Plaintiff voiced its objections.  (*See* FPTCO, p. 6.)

16.    Defendants also used the stylized font in which the mark LEXUS is typically displayed on license plate frames placed on LEXUS vehicles at Lexus dealers prior to delivery to Defendants' customers. (FPTCO, p. 5.)

17.    Even though Defendants were aware of the mark LEXUS and its reputation for high quality prior to the adoption of Defendants' domain names, they did not consult with any attorney regarding the availability of those domain names and did not conduct any trademark search prior to adopting those domain names. (*Id.*)

18.    Defendants have prominently displayed the designation WWW.BUYORLEASELEXUS.COM on their website and in their television, motion picture and newspaper advertising material, as well as on promotional license plate

7

frames, as an identification of their business and the services which it renders. (Plaintiff's Exs. 34, 43, 45, 50-52, 54 and 71.)

19.     Defendants' television advertising also referred to automobiles other than LEXUS automobiles that Defendants were offering through their automobile brokerage service. (Tran., p. 98.)

20.     Defendants' license plate frames displaying Plaintiff's stylized presentation of the mark LEXUS are a form of advertising directed to their domain name. (Tran., pp. 88-89.)

21.     At trial, Defendants offered a screen display of their current website which included the following disclaimer: "We are not an authorized Lexus dealer or affiliated in any way with Lexus.  We are an Independent Auto Broker."  (Tran., pp. 206-207; Defendants' Ex. 29.)

C.     **PLAINTIFF'S FIRST KNOWLEDGE OF DEFENDANTS' DOMAIN NAMES AND SUBSEQUENT EFFORTS TO PROTECT PLAINTIFF'S TRADEMARK RIGHTS**

1.     Plaintiff   first   became   aware   of   Defendants'   domain   name <www.buyorleaselexus.com> in January of 2001. (Tran., pp. 121-122.)  Jason Schulz, Plaintiff's Dealer Interactive Manager, typed that domain name in the search bar on his computer and was taken to Defendants' website. (*Id.*, pp. 121-122 and 128-129.)

2.     Mr. Schulz initially thought the website in question was sponsored by a Lexus dealer because he was aware that Plaintiff had previously registered the domain name <www.buyalexus.com>. (*Id.*, p. 121.)

8

3.    Mr. Schulz subsequently determined that Defendants (Fast Imports) was the owner of the domain name in question and that this website was not authorized. (*Id.*, p. 122.)

4.    After making that determination, Mr. Schulz referred the matter to Plaintiff's in-house counsel, Mark Smith,[2] and had no further involvement in this matter. (*Id.*, pp. 122-123 and 138-139.)

5.    Defendants' position that Plaintiff should have been aware of Defendants' domain names as early as December 1999 because of Defendants' business relationship with Cobalt is based on a belief rather than any facts showing any earlier awareness of those domain names on the part of Plaintiff. (Tran., pp. 227-228.)

6.    Plaintiff's counsel Eric Fingerhut sent a letter to Defendants on July 18, 2001 objecting to the use of Defendants' domain names. (FPTCO, p. 6; Plaintiff's Ex. 62.)

7.    After receiving Mr. Fingerhut's letter of July 18, 2001, Ms. Tabari contacted Robert Boyajian, the first of several attorneys who would represent Defendants in this matter. (Tran., pp. 184-185.)

8.    On July 26, 2001, Mr. Fingerhut received a telephone message from Mr. Boyajian, who identified himself as Defendants' counsel. (FPTCO, p. 6.)  Mr. Fingerhut returned Mr. Boyajian's telephone call on July 26, 2001, but was unable to

---

[2]    The Court is not persuaded by Defendants' arguments that Mr. Schulz's reference to "Mark" rather than "Martin" Smith and other alleged inconsistencies detract from Mr. Schulz's credibility.

reach Mr. Boyajian and left a message requesting him to return the call.  (FPTCO, p. 6; Declaration of Eric T. Fingerhut, dated Aug. 24, 2005 ("Fingerhut Dec."), ¶ 4.)

9.    When Mr. Boyajian did not return the July 26, 2001 telephone call, Mr. Fingerhut placed another call to Mr. Boyajian's office on July 30, 2001, and left another message requesting Mr. Boyajian to contact him.  (Fingerhut Dec., ¶ 4.)

10.    Mr. Fingerhut and Mr. Boyajian spoke by telephone on July 31, 2001. (FPTCO, p. 6.; Declaration of Robert Boyajian ("Boyajian Dec."), ¶3.)  During that conversation, Mr. Boyajian informed Mr. Fingerhut that Defendants had received a license from Cobalt, the company that created and hosted Defendants' web site. (FPTCO, p. 6; Fingerhut Dec., ¶ 5.)  On receiving that information, Mr. Fingerhut requested Mr. Boyajian to provide documentation of such a license so that he could respond more fully. (Fingerhut Dec., ¶ 5.)

11.    Following the July 31, 2001 telephone conversation with Mr. Boyajian, Mr. Fingerhut determined that Plaintiff had not authorized Cobalt to license the use of Plaintiff's marks and that Cobalt had not given any such license to Defendants. (*Id.*, ¶ 6.)

12.    Mr. Fingerhut did not receive any communication or material from Mr. Boyajian in response to his July 31, 2001 request for documentation of the claimed license from Cobalt to Fast Imports. (*Id.*, ¶ 7.) Mr. Boyajian's Declaration, executed on December 23, 2004, does not indicate that any information regarding the claimed license was ever provided to Mr. Fingerhut. (*See* Boyajian Dec.)

13.    Mr. Fingerhut has no recollection of speaking to Mr. Boyajian on September 28, 2001, or any other time after July 31, 2001, or of receiving a voice mail message from

10

Mr. Boyajian on October 17, 2001. (Fingerhut Dec. ¶ 8.)  Mr. Fingerhut's review of his case file and time entry records during the relevant timeframe did not disclose any reference to or record of any telephone conversation with Mr. Boyajian on September 28, 2001, or any voice mail message from Mr. Boyajian on October 17, 2001.  (*Id.*)

14.    As a matter of routine follow-up, Mr. Fingerhut telephoned Mr. Boyajian on December 2, 2001 and again on January 31, 2002, to request documentation of the claimed license, but was unable to reach Mr. Boyajian.  (*Id.,* ¶ 9.)  In each instance, Mr. Fingerhut left a message for Mr. Boyajian but did not receive any response. (*Id.*)[3]

15.    Based on Mr. Boyajian's lack of response to any of these messages, Mr. Fingerhut concluded that Defendants most likely were no longer represented by Mr. Boyajian and sent a letter directly to Defendants on February 25, 2002 via Federal Express courier service which was returned as undeliverable.  (*Id.,* ¶ 10; Plaintiff's Ex. 63.)

16.    On April 17, 2002, Mr. Fingerhut sent a copy of the February 25, 2002 letter to Ms. Tabari via email transmission which Ms. Tabari received on April 19, 2002. (FPTCO, p. 6; Tran., p. 187; Plaintiff's Ex. 64.)

17.    Shortly after sending the April 17, 2002 email to Ms. Tabari, Mr. Fingerhut received a telephone call from Mark Silverman, who identified himself as a new counsel for Defendants. (FPTCO, p. 6.) Mr. Silverman informed Mr. Fingerhut that he was going to advise Defendants to remove Plaintiff's logos from their website and add a disclaimer.

---

[3]  Mr. Boyajian's declaration does not address these messages left by Mr. Fingerhut.

(*Id.*)  There is no evidence of any further contacts between Mr. Fingerhut and Mr. Silverman.

18.     On July 24, 2002, Ms. Tabari sent Mr. Fingerhut an email with an attached copy of an email dated June 12, 2002, purportedly sent to Mr. Fingerhut by John Dozier, the third in a series of counsel for Defendants, and claimed that Mr. Fingerhut had not responded to Mr. Dozier's email.  (FPTCO, pp. 6-7.)

19.     On August 9, 2002, Ms. Tabari sent Mr. Fingerhut a letter. (FPTCO, p. 7; Plaintiff's Ex. 66.)  Mr. Fingerhut responded by letter dated August 28, 2002, which was returned by Federal Express as undeliverable.  Ms. Tabari received a copy of the August 28, 2002 letter as an attachment to Mr. Fingerhut's email of September 23, 2002. (FPTCO, p. 7; Tran., pp. 192-193; Plaintiff's Ex. 68.)

20.     Mr. Fingerhut's letter of August 28, 2002, set forth the chain of earlier correspondence and requested Defendants to cease using the domain names and service mark in question. (Plaintiff's Ex. 67.)

21.     Ms. Tabari responded to Mr. Fingerhut's email of September 23, 2002, by an email dated October 6, 2002, advising that John Dozier no longer represented Defendants and that Defendants refused to discontinue using the subject domain names and service mark.  (Tran., pp. 194-196: Plaintiff's Ex. 69.)

22.     Plaintiff contended, in Plaintiff's proposed Findings of Fact and Conclusions of Law After Court Trial, that on January 24, 2003, Mr. Fingerhut sent a letter to Ms. Tabari inquiring whether Defendants had obtained new counsel; reiterating Plaintiff's objection to the use of the domain names and service mark in question; and attaching a

draft complaint that Mr. Fingerhut stated Plaintiff would file if Defendants did not agree to cease the objectionable domain names and service mark.  However, this purported letter, Plaintiff's Ex. 70 for identification, was not offered into evidence.  Defendants deny having received this letter.  (*See* Tran. 195.)

23.    When Defendants did not discontinue using the domain names and service mark in question, Plaintiff filed a complaint initiating this civil action on June 3, 2003. (FPTCO, p. 7.)

**D.    PLAINTIFF'S DECISION TO FILE SUIT**

1.    The record demonstrates use of Defendants' domain names and the designation WWW.BUYORLEASELEXUS.COM in a prominent, stylized, origin-indicating manner to identify their automobile brokerage business. (Plaintiff's Exs. 34, 43, 45, 50-52, 54 and 71.)

2.    Plaintiff's purpose in filing this civil action was solely to stop the use of Defendants' domain names, which infringe the mark LEXUS. (Tran., pp. 53-54.)

3.    Consistent with that objective, the complaint did not seek compensatory damages; rather the principal remedy sought is a permanent injunction. (Tran., pp. 231-232.)

4.    Defendants admit that they could continue in business without any interference from Plaintiff if they changed their domain names to eliminate LEXUS. (*Id.,* p. 232.)

# II.  CONCLUSIONS OF LAW

## A.    PLAINTIFF'S CLAIMS

1.    Plaintiff has asserted claims for trademark infringement, trade name infringement, and unfair competition under the Federal Trademark Act, 15 U.S.C. § 1051 *et seq.,* and California statutes and common law.

2.    To prevail on its claims for infringement and unfair competition, Plaintiff must establish that: (a) the mark LEXUS is valid, and (b) Defendants' use of the domain names <www.buyorleaselexus.com> and <www.buy-a-lexus.com>, and the commercial designation WWW.BUYORLEASELEXUS.COM is likely to cause confusion. *E.g., Comedy III Prods., Inc. v. New Line Cinema,* 200 F.3d 593, 594 (9th Cir. 2000).

3.    In the Ninth Circuit a finding of infringement can be based on initial interest confusion even though no actual sale is finally completed as a result of the confusion. *Playboy Enters., Inc. v. Netscape Commc'ns. Corp.,* 354 F.3d 1020, 1025 (9th Cir. 2004); *Brookfield Commc'ns., Inc. v. West Coast Entm't. Corp.,* 174 F.3d 1036, 1062 (9th Cir. 1999); *see also Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1404 n.14 (9th Cir. 1997).  For example, in *Brookfield Communications,* the Ninth Circuit held that "[a]lthough there is no source confusion in the sense that consumers know they are patronizing West Coast rather than Brookfield, there is nevertheless initial interest confusion in the sense that, by using 'moviebuff.com' or 'MovieBuff' to divert people looking for 'MovieBuff' to its website, West Coast improperly benefits from the goodwill that Brookfield developed in its mark."

14

## 1.   Validity

4.     Registration Nos. 1,574,718, 1,675,339, 1,739,201 and 2,016,803 of the mark LEXUS each have achieved incontestable status under § 15 of the Federal Trademark Act, 15 U.S.C. § 1065.

5.     Section 33(b) of the Federal Trademark Act, 15 U.S.C. § 1115, provides, in pertinent part, that "[t]o the extent that the right to use the registered mark has become incontestable under section 15, the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark . . . ."

6.     The mark LEXUS and Registration Nos. 1,574,718, 1,675,339, 1,739,201 and 2,016,803 thereof accordingly are each valid and entitled to protection.

## 2.   Likelihood of Confusion

7.     In determining whether confusion is likely, the following factors are considered: (a) the strength of the plaintiff's mark; (b) the proximity of the goods or services in issue; (c) the similarity of the marks in issue; (d) any evidence of actual confusion; (e) the marketing channels used by the parties; (f) the type of goods or services and the degree of care likely to be exercised by purchasers; (g) the defendant's intent in selecting its mark; and (h) the likelihood of expansion of the product lines ("*Sleekcraft* factors"). *E.g., GoTo.com v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000); *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979).

8.     The most important of the *Sleekcraft* factors are the similarity of the marks, the commercial relationship of the services, and the channels of trade in which the goods

or services in question move. *See GoTo.com,* 202 F.3d at 1205; *Downing v. Abercrombie & Fitch,* 265 F.3d 994, 1008 (9th Cir. 2001).

9.   In an Internet context "the three most important *Sleekcraft* factors in evaluating a likelihood of confusion are 1) similarity of the marks, 2) the relatedness of the goods or services and 3) the parties' simultaneous use of the Web as a marketing channel." *Interstellar Starship Servs., Ltd. v. Epix, Inc.,* 304 F.3d 936, 942 (9th Cir. 2002).

10.   Likelihood of confusion often is established by circumstantial evidence directed to the *Sleekcraft* factors without the introduction of any survey evidence. *See, e.g., Bose Corp. v. QSC Audio Prods., Inc.,* 293 F.3d 1367, 1371 (Fed. Cir. 2002); *Tools USA & Equip. Co. v. Champ Frame Straightening Equip.,* 87 F.3d 654, 660-61 (4th Cir. 1996).

###   a.   *The Strength of the Mark LEXUS*

11.   The strength of a trademark "is evaluated in terms of its conceptual strength and commercial strength." *GoTo.com,* 202 F.3d at 1207.

12.   LEXUS is a coined word having no dictionary meaning and has no significance other than as identifying a line of automobiles and related goods and services. (FPTCO, p. 4; Tran., p. 40.) Thus, from a conceptual perspective, LEXUS is an inherently highly distinctive mark that is "entirely the product of the imagination and evoke[s] no associations with human experience that relate intrinsically to the product." *Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 216 (2d Cir. 1999).

13.   Some factors used in assessing the commercial strength of a mark include the length of use, advertising expenditures, and sales. *See Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988).

14.   In view of the inherent distinctiveness of the mark LEXUS, the conclusive evidentiary effect of the incontestable federal registrations of that mark, and the extensive advertising and sales of LEXUS vehicles since 1989, as well as the accolades the LEXUS line has received, LEXUS is a strong mark which, as a matter of law, is entitled to a broad scope of protection. Federal Trademark Act § 33(a), 15 U.S.C § 1115; *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1130-31 (9th Cir. 1998); *Century 21 Real Estate Corp.*, 846 F.2d at 1179.

### b.   *The Proximity of the Goods and Services at Issue*

15.   "The parties' goods need not be identical or directly competitive . . . for there to be a likelihood of confusion.  They need only be related in some manner, or the conditions surrounding their marketing be such that they could be encountered by the same purchaser under circumstances that could give rise to the mistaken belief that the goods come from a common source." *Garden of Life, Inc. v. Letzer*, 318 F. Supp. 2d 946, 964 (C.D. Cal. 2004) (citations omitted).

16.   "Related goods are those goods which, though not identical, are related in the minds of consumers." *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1363 (9th Cir. 1985).

17.   "Where goods are related or complementary, the danger of consumer confusion is heightened." *E&J Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291

(9th Cir. 1992).  *See also Electropix v. Liberty Livewire Corp.*, 178 F. Supp.2d 1125, 1130 (C.D. Cal. 2001).

18.   Because both Plaintiff and Defendants are in the business of selling LEXUS automobiles (one through authorized dealers and one as a broker), there is no dispute that the parties' businesses are commercially related and, as noted in Defendants' opening statement, are in fact complementary.  (Tran., p. 29.)

### c.   *The Similarity of the Marks in Issue*

19.   The similarity of the marks in issue "has always been considered a critical question in the likelihood of confusion analysis."  *GoTo.com*, 202 F.3d at 1205.

20.   In assessing the similarity of the marks, the marks must be considered in their entireties and as they appear in the marketplace. *Id.* at 1206.

21.   The inclusion of the top level domain designation .com does not communicate information as to source and is generic. *See, e.g., Brookfield Commc'ns., Inc.*, 174 F.3d at 1055; *Image Online Design, Inc. v. Core Ass'n.*, 120 F. Supp. 2d 870, 877-78 (C.D. Cal. 2000).

22.   Like the top level domain designation .com, no consideration is given to the presence of descriptive or generic wording in assessing the similarity of the marks and names in issue.  *Electropix*, 178 F. Supp. 2d at 1132; *see also, Golden Door, Inc. v. Odisho*, 646 F.2d 347, 350 (9th Cir. 1980).

23.   Accordingly, Defendants' domain names and the designation WWW.BUYORLEASELEXUS.COM which incorporate the mark LEXUS in combination with descriptive wording and the .com top level domain are confusingly

similar to Plaintiff's mark LEXUS. There is nothing in the "WWW.BUYORLEASE" or ".COM" portions of Defendants' designation that suggests that it is <u>not</u> merely another authorized and affiliated use of the world famous LEXUS trademark. Anyone who might be shopping for a LEXUS knows that LEXUS buys and lease automobiles through its authorized dealers, and can be expected to assume that such a profitable and sophisticated company would use the worldwide web. Thus, a potential car buyer is likely to conclude that WWW.BUYORLEASELEXUS.COM is a website sponsored by Plaintiff.

24.     The mere addition of a disclaimer to Defendants' website does not preclude a finding that confusion is likely. *See U.S. Jaycees v. Phila. Jaycees,* 639 F.2d 134, 142 (3d Cir. 1981); *E&J Gallo Winery v. Gallo Cattle Co.,* 12 USPQ2d 1657 (E.D. Cal. 1989), *aff'd,* 955 F.2d 1327 (9th Cir. 1992), *amended,* 967 F.2d 1280 (9th Cir. 1992).

### d.     *Evidence of Actual Confusion*

25.     Plaintiff has not presented any evidence of actual confusion.

26.     However, the absence of such evidence does not preclude a finding that confusion is likely. *E.g., GoTo.com,* 202 F.3d at 1208. *See Paul Sachs Originals Co. v. Sachs,* 325 F.2d 212, 216 (9th Cir. 1963).

### e.     *Marketing Channels*

27.     In the context of the use of the Internet as a substantial marketing and advertising channel by the parties, such usage "is particularly susceptible to a likelihood of confusion . . . [because] it allows for competing marks to be encountered at the same time, on the same screen." *GoTo.com,* 202 F.3d 1207.

28.     Because both Plaintiff and Defendants advertise their products and services to individual members of the general public through similar and overlapping, if not identical, marketing channels including the Internet, this factor strongly weighs in Plaintiff's favor in determining that confusion is likely.

### f.     *Types of Goods and Degree of Care*

29.     Even though the product at issue in this case is a relatively expensive line of automobiles, which is likely to engender somewhat greater care on the part of consumers, that greater degree of care does not preclude a likelihood of confusion as to the sponsorship, approval, or affiliation of Defendants' business because the products and services in issue are marketed under substantially similar -- if not identical -- marks. *E.g., Electropix*, 178 F. Supp. 2d at 1134.

### g.     *Defendants' Intent in Selecting Its Domain Name*

30.     "When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." *Id.* (citation omitted) The Court, however, finds no intent to "deceive" members of the public into thinking they were buying anything other then a LEXUS.  Further, the Court finds that Defendants did not intend to deceive members of the public into thinking they were buying a LEXUS through an authorized dealer.

31.     Rather, Defendants' prior awareness of the mark LEXUS and its reputation for high quality, as well as Defendants' use of Plaintiff's highly stylized form of that mark and L Symbol Design mark in advertising their business and on their website, support an inference that Defendants intended to benefit from the strong public recognition of the

mark LEXUS rather than creating their own identify under the name and mark FAST IMPORTS.

32.     The absence of wrongful intent does not, as a matter of law, preclude liability for trademark infringement and unfair competition because such liability focuses on the objective effect of Defendants' conduct, not their intent.  *See, e.g., GoTo.com*, 202 F.3d at 1208.  *See also Self-Ins. Inst. of Am., Inc. v. Software & Info. Indus. Assoc.*, 208 F. Supp. 2d 1058, 1074 (C.D. Cal. 2000).

33.     While there is no express finding of wrongful intent on Defendants' part, the absence of such evidence does not preclude the conclusion that confusion is likely in this instance.

### h.     *Likelihood of Expansion of the Product Lines*

34.     The likelihood of expansion confusion factor "is relatively unimportant where two companies already compete to a significant extent" as they do in this instance.  *GoTo. com*, 202 F.3d at 1209; *Brookfield Commc'ns., Inc.*, 174 F.3d at 1060.

### 3.     Initial Interest Confusion

35.     Here, the most obvious form of confusion is "initial interest confusion."  A finding of infringement can be based on initial interest confusion even though no actual sale is finally completed as a result of the confusion.  *Playboy Enters., Inc.*, 354 F.3d at 1025; *Brookfield Communc'ns., Inc.*, 174 F.3d at 1062; *Dr. Seuss Enters., L.P.*, 109 F.3d at 1405.

36.     "Initial interest confusion is customer confusion that creates initial interest in a competitor's product.  Although dispelled before an actual sale occurs, initial interest

21

confusion impermissibly capitalizes on the goodwill associated with a mark and is therefore actionable trademark infringement." *Playboy Enters., Inc.*, 354 F.3d at 1025 (footnotes omitted).

37.     Consumers who encounter Defendants' domain names and the designation WWW.BUYORLEASELEXUS.COM are likely to assume, at least initially, that Defendants' business is sponsored, approved by, or somehow affiliated with Plaintiff. Even if that initial confusion were subsequently dispelled, it nonetheless is actionable because it drives business to Defendants' website by trading on the exceptionally strong public recognition of the LEXUS brand. *See, e.g., Brookfield Communc'ns., Inc.*, 174 F.3d at 1063-64.

38.     Here Defendants' disclaimer is to no avail. Even if consumers immediately realize -- on seeing the disclaimer -- that Defendants are entirely independent of Plaintiff, "the damage has been done: Through initial consumer confusion, the competitor will still have gained a customer by appropriating the goodwill [Toyota] has developed in its [ ] mark." *Playboy Enters., Inc.*, 354 F.3d at 1025 (citation and internal quotation omitted; second alteration in original).

39.     As contemplated in *Brookfield Communications,* Defendants' additional use of "Lexus Broker" as a metatag on various search engines (Tran., pp. 208-209) is likely to cause Defendants' website to be listed in search engine results alongside Plaintiff's website resulting in initial interest on the part of Internet users who encounter Defendants' website in this context.

40.    As a result of the use of LEXUS in their domain names and in the designation WWW.BUYORLEASELEXUS.COM as well as the use of "Lexus Broker" in metatags, Defendants are benefitting from initial interest confusion and the goodwill Plaintiff has developed in the mark LEXUS.

### 4.    Conclusion

41.    Plaintiff has met its burden of proving that Defendants' use of the domain names <www.buyorleaselexus.com> and <www.buy-a-lexus.com> and the designation WWW.BUYORLEASELEXUS.COM is likely to cause confusion with respect to the source, sponsorship or approval of Defendants' automobile brokerage business and the services which that business renders.   Such use accordingly constitutes trademark infringement and unfair competition under §§ 32(1) and 43(a) of the Federal Trademark Act, 15 U.S.C. §§ 1114(1) and 1125(a), respectively, and at common law.

## B.    DEFENDANTS' AFFIRMATIVE DEFENSES

### 1.    Laches

1.    Laches is an affirmative defense as to which Defendants have the burden of proof.  *See, e.g., Jarrow Formulas, Inc. v. Nutrition Now, Inc.,* 304 F.3d 829, 835 (9th Cir. 2002)

2.    To prevail on a laches defense, Defendants must establish the following: (a) when Plaintiff first learned or should have learned of the usage in question; (b) Plaintiff delayed unreasonably in objecting to Defendants' domain names, and (c) Defendants relied to their detriment on such delay. *Id.* at 838.

### a.  *Plaintiff's First Knowledge*

3.    There is no evidence that Plaintiff first became aware of Defendants' use of the domain names in question earlier than January 2001. (*See* Tran., pp. 121-122.)

4.    Although Defendants argue that Plaintiff should have been aware of such usage at an earlier date by virtue of Plaintiff's business relationship with Cobalt, no evidence has been presented that suggests, much less establishes, that Cobalt had some legal duty to inform Plaintiff of adverse uses of the mark LEXUS.[4]

5.    While Lexus dealers are a source of information with respect to infringing uses of the mark LEXUS, Defendants admit there is no evidence of any legal obligation, or contractual agreement to report such uses to Plaintiff. Def. Post-Trial Memo. at 19. Any knowledge of Defendants' use of the domain names that may have been acquired by a Lexus dealer since December 1999 cannot be imputed to Plaintiff. *See Dawn Donut v. Hart's Food Stores*, 267 F.2d 358, 363 (2d Cir. 1959) ("In order to impute an agent's knowledge to a principal in a particular transaction, it must be shown that the agent at some time had some duties to perform on behalf of the principal with respect to the transaction, although the agent need not have acquired his knowledge in connection with those duties.").

---

[4] This Court has reviewed *in camera* documents previously withheld by Plaintiff during discovery. The Court has determined that nothing in those documents assists Defendants as to any issue in this litigation.

**b.**   *Reasonableness of Plaintiff's Delay*

6.     The approximately six-month period between January 2001 when Plaintiff first learned of Defendants' domain names and July 18, 2001 when the initial demand letter was sent does not constitute a "delay" sufficient to support a laches defense. *E.g.,* *Nat'l. Van Lines v. Dean*, 237 F.2d 688, 693-94 (9th Cir. 1956) (two year delay in complaining to infringer and additional one year delay does not give rise to laches); *Cellularm Inc. v. Bay Alarm Co.*, 20 U.S.P.Q.2d (BNA) 1340, 1347 (N.D. Cal. 1991) (thirteen-month delay does not support a finding of laches).

7.     Even assuming that Plaintiff should have been aware of Defendants' domain names as early as December 1999, the resulting time lapse of twenty months until July 2001 when the initial demand letter was sent, would not support a laches defense. *See id.*

8.     The six-month delay from January to July of 2001, and even a delay from January 2001 until suit was filed in June of 2003 are less than the analogous three-year statute of limitations in Cal. Civ. Proc. § 338(d). Therefore, there is a strong presumption that the delay in this instance is reasonable -- which precludes a laches defense. *See, e.g., Jarrow Formulas, Inc.*, 304 F.3d at 835.

9.     Defendants have not presented evidence sufficient to rebut the strong presumption that Plaintiff's delay of less than three years is anything other than reasonable.

10.     While Plaintiff certainly could have been more aggressive in pursuing its claims, and Defendants could have been better served by the various attorneys they

25

contacted, the communications that occurred between the parties from July 2001 until June 2003 nevertheless also suggests that laches does not bar Plaintiff's claims. *See Gallo Cattle Co.*, 12 U.S.P.Q.2d (BNA) at 1676; *Earth Tech. Corp. v. Envtl. Research & Tech., Inc.*, 222 U.S.P.Q. 585, 586-87 (C.D. Cal. 1983).

### c.   *Prejudice to Defendants*

11.   To establish laches, Defendants also must show they were prejudiced by Plaintiff's delay. *Jarrow Formulas, Inc.*, 304 F.3d at 838.

12.   Although Defendants allude to the expenditure of $250,000 in advertising costs, they provide little specific information as to when and in what amounts these funds were expended.  They do indicate that they spent $1000 for license plate frames, but it seems this was spent even before Plaintiff knew of Defendants' use of the domain name. (Tran. 200.)  Indeed, Defendants are willing to cease using the frames.  (Tran. 201.) Defendants' claim of financial prejudice based on the fact that they ceased advertising their business due to Plaintiff's communications is unpersuasive because the decision to stop advertising their business was based on its lack of success, not any claimed delay. (Tran., pp. 199-200, 208, 214-15.) Defendants have not claimed that they spent funds in reliance on Plaintiff's inaction or delay. Here, for unexplained reasons, Cobalt ceased charging Defendants for maintaining their website from early 2001 through the end of 2004. (Tran. 180-81.)

13.   Thus, while Defendants may suffer financial harm if they are required to obtain a new domain name, business cards, etc., (which was argued in Defendants' post-

trial briefing but not supported by evidence) that prejudice was not caused by the *delay*, but rather by the initial misuse of the LEXUS name.

14.    Moreover, Defendants have brokered only about 60 cars since December 1999, with fewer brokered in recent years. (Tran. 213.)  They have not established any significant loss of goodwill.

15.    Defendants themselves contend that the prejudice from the delay has been "evidentiary" rather than financial. (*Id.*)  But Defendants have not established how the witnesses they are unable to locate would assist them.

16.    Defendants have not met their burden of proof with respect to the laches defense.

### 2.    Acquiescence

17.    Acquiescence is an affirmative defense as to which Defendants bear the burden of proof.  *Grey v. Campbell Soup Co.*, 650 F. Supp. 1166 (C.D. Cal. 1986).

18.    To establish acquiescence, Defendants have the burden of proving some affirmative conduct on the part of Plaintiff that manifests its consent to the usage in question.  *See, e.g., Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 462 (4th Cir. 1996); *Coach House Restaurant, Inc. v. Coach & Six Restaurants, Inc.*, 934 F.2d 1551, 1558 (11th Cir. 1991); *Pasatiempos Gallo*, 905 F. Supp. at 1414; *Plasticolor Molded Products,* 698 F. Supp. at 202-03.

19.    Mere silence, which is the basis for a laches defense, is not sufficient to establish acquiescence.   T. J. McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 31:41 at 31-88 (4th ed. 2000).

20.     Thus, to establish acquiescence Defendants must show some affirmative conduct by Plaintiff that induced Defendants to believe that Plaintiff had abandoned its claim. *E.g., Pasatiempos Gallo,* 905 F. Supp. at 1414.

21.     There is no evidence of affirmative conduct by Plaintiff that manifests a consent to Defendants' use of the domain names in issue.

22.     Although Defendants initially asserted that Plaintiff's business relationship with Cobalt, and Cobalt's conduct in setting up their site, established some form of acquiescence, the record shows that the "relationship" involved nothing more than Cobalt providing website creation and hosting services to Plaintiff and its franchised Lexus dealers. There is no evidence that this "relationship" created a contractual or other obligation or right in Cobalt to act on Plaintiff's behalf in approving or acquiescing in Defendants' conduct, and Plaintiffs admitted at trial that they did not believe that Cobalt had the authority to authorize them to use the name Lexus in their domain name. (Tran., p. 217-18.)[5]

23.     Defendants have not met their burden of proof with respect to the acquiescence defense.

### 3.     Fair Use

24.     Fair use is an affirmative defense as to which Defendants bear the burden of proof. *See New Kids on the Block v. News Am. Publ'g., Inc.,* 971 F.2d 302, 308 (9th Cir. 1992).

---

[5] As noted previously, the Court has reviewed documents provided by Plaintiff in camera, and no such evidence is contained in those documents.

28

25.     There are two basic forms of the fair use defense: (a) the classic fair use defense codified in Section 33(b)(4) of the Federal Trademark Act, 15 U.S.C. § 1115(b)(4), which insulates a defendant from liability where the challenged term is used fairly and in good faith, not as a trademark, to describe the defendant's goods or services as distinguished from the plaintiff's goods or services; and (b) the nominative fair use defense where the defendant uses the plaintiff's mark to describe or refer to the plaintiff's product. *See Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1150 (9th Cir. 2002); *New Kids on the Block*, 971 F.2d at 308.

26.     Defendants are relying on the nominative fair use defense, Def. Pretrial Memo. of Contentions of Fact and Law at 5, and have the burden of establishing the following elements of that defense:  (a) Defendants' automobile brokerage services cannot be readily identified without using the mark LEXUS; (b) only so much of the mark LEXUS may be used as is reasonably necessary to identify Defendants' services; and (c) Defendants have not done anything in connection with their use of LEXUS that would suggest Plaintiff's sponsorship or endorsement.  *See KP Permanent Make-Up, Inc., v. Lasting Impression I, Inc.*, 328 F.3d 1061, 1072 (9th Cir. 2003), *rev'd on other grounds,* 543 U.S. 111 (2004); *New Kids on the Block*, 971 F.2d at 308.

27.     A domain name often functions as an indication of origin or ownership, *i.e.,* as a trademark, rather than as a descriptive term.  *See, e.g., Panavision Int'l. LP v. Toeppen*, 141 F.3d 1316, 1318, 1327 (9th Cir. 1998); *Mirage Resorts, Inc. v. Stirpe*, 152 F. Supp. 2d 1208, 1217 (D. Nev. 2000).

28.     Use of a trademark name to describe the services provided may be "fair use" where the trademark's distinctive lettering style, color scheme, or distinctive emblem is not used. *See Volkswagenwerk Aktingesellschaft v. Church*, 411 F.2d 350, 352 (9th Cir. 1969).  Thus, Defendants may have been able to use non-stylized references to Lexus automobiles on the website itself without infringing. But domain names have no stylized letters, colors or symbols (at least at the present time).  Thus, mere use of "lexus" (capital letters are not used) in a domain name generally[6] implies sponsorship or endorsement and is not nominative fair use.

29.     But even if the nominative fair use were available to Defendants, they have not met their burden of establishing this defense.

30.     Defendants have not shown that their automobile brokerage business cannot be readily identified without using the mark LEXUS.

31.     The evidence adduced at trial establishes that it is not necessary to use the name and mark of an automobile to identify an automobile brokerage business. Specifically, other automobile brokerage businesses have registered or applied to register the following service marks to identify their businesses which do not include a well-known automotive brand:

> (a)     Registration No. 1,458,670 of the mark YOUR CREDIT UNION CAR, for new car brokerage services, which issued September 22, 1987 to Stan L. Swartz, an individual doing business in Phoenix,

---

[6] The domain name "donotbuylexus" presumably would not imply sponsorship.

Arizona, based on first use of this mark in interstate commerce on April 1986. (Plaintiff's Ex. 5.)

   (b)   Application Serial No. 76/344,250 of the mark FINDABUYER.COM, for automotive brokerage services, was filed by FindaBuyer, LLC, a business located in Hanson, Kentucky, based on first use of this mark in interstate commerce on May 20, 2001. (Plaintiff's Ex. 6.)

   (c)   Application Serial No. 73/597,695 of the mark NEW CAR STORE, for membership new car brokerage services, was filed by Stan L. Swartz, an individual doing business in Phoenix, Arizona, based on first use of this mark in interstate commerce on April 16, 1986. (Plaintiff's Ex. 7.)

32. The prominent usage of WWW.BUYORLEASELEXUS.COM on Defendants' web page and in their advertising in a prominent, stylized form to identify Defendants' business is inconsistent with the notion that Defendants have used only so much of the mark LEXUS as is reasonably necessary to describe automobile brokerage services.

33. Defendants' admission at trial that they could continue in business without any interference from Plaintiff if they change their domain names to eliminate LEXUS undercuts their reliance on the nominative fair use defense. (Tran., p. 231.)

34. Defendants' prominent use of Plaintiff's stylized presentation of the mark LEXUS on their website and license plate frames, as well as the prominent use of

WWW.BUYORLEASELEXUS.COM in their advertising, also are fundamentally inconsistent with the third element of the nominative fair use defense, namely, that Defendants have done nothing that would suggest Plaintiff's sponsorship or endorsement.

### 4.    License

35.    No evidence was introduced at trial that supports Defendants' belief that Cobalt had authority to allow Defendants to use their domain names. (Tran., pp. 229-230.) None was contained in the documents provided to the Court *in camera.*

36.    Defendants have not met their burden of proving the license defense.

### 5.    Inequitable Conduct, Unclean Hands and Trademark Misuse

37.    Defendants maintain that the filing of this civil action supports the affirmative defense of inequitable conduct, unclean hands and trademark misuse.

38.    However, the filing of civil actions by trademark owners against infringers does not constitute unclean hands, trademark misuse, or inequitable conduct. *See Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1257-58 (9th Cir. 1982);

39.    Defendants have presented no evidence that Plaintiff initiated this civil action other than in good faith as part of its general enforcement efforts and to stop Defendants from using domain names that it believes are likely to cause confusion.

40.    Defendants have not met their burden of proof with respect to the defense of inequitable conduct, unclean hands and trademark misuse.

### 5.    __Abandonment__

41.    Abandonment is an affirmative defense as to which Defendants bear the burden of proof. *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1516 (11th Cir. 1984).

42.    Because a finding of abandonment results in a forfeiture of the plaintiff's rights, it must be strictly proved. *See, e.g., Prudential Ins. Co. v. Gibraltar Financial Corp.*, 694 F.2d 1150, 1156 (9th Cir. 1982), *cert. denied*, 463 U.S. 1208 (1983).

43.    Section 45 of the Federal Trademark Act, 15 U.S.C. § 1127, defines the two basic types of abandonment: (a) discontinuation of use of a registered mark with an intent not to resume such use, and (b) some course of conduct on the part of the owner of the mark, including acts of omission as well as commission, that causes the mark to lose its significance as a mark.

44.    As the record shows that Plaintiff's mark LEXUS has been in continuous use since September 1989, the first form of abandonment -- discontinuation of use with no intent to resume use -- is inapplicable.

45.    The second form of abandonment, often characterized as constructive abandonment, cannot be based on a trademark owner's purported failure to enforce its rights against third parties. *Big Island Candies, Inc. v. Cookie Corner*, 244 F. Supp. 2d 1086, 1095 (D. Haw. 2003) (citing *Century 21 Real Estate Corp.*, 846 F.2d at 1181 (discovery that revealed other potential infringers would be irrelevant under law of Ninth Circuit); *U.S. Jaycees,* 354 F. Supp. at 73-74 (existence of other infringers is irrelevant to whether defendant's acts should be enjoined).

46.    Defendants have not presented any evidence establishing, or even

33

addressing, any form of constructive abandonment.

47.     Defendants have not met their burden of proof with respect to either form of the abandonment defense.

### 6.     Lack of Standing and Failure to Join Indispensable Party

48.     The party asserting jurisdiction has the burden of establishing it. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

49.     Standing is a jurisdictional doctrine. *United States v. Hays*, 515 U.S. 737, 742 (1995).

50.     Defendants' assertion that Plaintiff has no standing because of its corporate status has no merit.   Nevertheless, the Court must consider whether Plaintiff has standing. *See id.* (Supreme Court must address standing even if the courts below have not addressed it and the parties have not raised it.)

51.     A claim for unfair competition under § 43(a) of the Federal Trademark Act, 15 U.S.C. § 1125(a) may be asserted by "any person who believes that he or she is likely to be damaged by the use of any such false description or representation . . . ."

52.     An exclusive distributor or licensee of a trademarked product has standing to maintain an action under § 43(a). *See, e.g., Norman M. Morris Corp. v. Weinstein*, 466 F.2d 137 (5th Cir. 1972); *STX Inc. v. Bauer USA Inc.*, 43 U.S.P.Q. 2d (BNA) 1492 (N.D. Cal. 1997).

53.     Plaintiff is the exclusive distributor of LEXUS vehicles in the United States and, therefore, has standing to maintain its § 43(a) claim for unfair competition.

54.     Section 32(1) of the Federal Trademark Act, 15 U.S.C. § 1114(1), provides

that a civil action for infringement may be brought by the registrant of the mark.

55.     Registrant includes the legal representative of the registrant.  15 U.S.C. § 1127.

56.     The record establishes that TMC has appointed Plaintiff as the exclusive distributor of LEXUS automobiles in the United States and vested Plaintiff with the exclusive right to use LEXUS in connection with the marketing and sale of automobiles. Plaintiff accordingly qualifies as a legal representative of TMC within the meaning of § 45 of the Federal Trademark Act and thus has standing to maintain an infringement claim under § 32(1).  *See Etri, Inc. v. Nippon Miniature Bearing Corp.*, No. 85 C 615, 1989 U.S. Dist. LEXIS 10129, *7, *10 (N.D. Ill. Aug. 17, 1989).

57.     Plaintiff has established standing.

58.     The party asserting that an indispensable party has not been joined bears the burden of establishing it.  *See Clinton v. Babbit*, 180 F.3d 1081, 1087 (9th Cir. 1999).

59.     Defendants have submitted no evidence that an indispensable party has not been joined.

## III.  RELIEF

Judgment shall be entered in Plaintiff's favor as follows:

A.     Defendants and all those acting in privity or concert with them are permanently enjoined from using the domain names <www.buyorleaselexus.com> and <www.buy-a-lexus.com>, the designation WWW.BUYORLEASELEXUS.COM, and/or any other domain name, service mark, trademark, trade name, meta tag or other commercial indication of origin that includes the mark LEXUS.

B.     Based on Plaintiff's post-trial representation, Plaintiff's prayer for an award of attorneys' fees pursuant to § 35(a) of the Federal Trademark Act, 15 U.S.C. § 1117(a), is dismissed with prejudice.

C.     Defendants' counterclaim for cancellation of the federal registrations of the mark LEXUS, which Defendants withdrew at the close of the trial, is dismissed with prejudice.

D.     Defendants' counterclaim for declaratory judgment, which presents the same issues addressed at trial, is dismissed with prejudice.

E.     Each party shall bear his, her or its own costs and attorneys' fees.


IT IS SO ORDERED.

Dated:   _3 - 8 - 06_                          _Dale Fischer_

                                              Dale S. Fischer
                                              United States District Judge